IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RICHARD DALE MINTON,

Plaintiff,

v.

KLAMATH COUNTY JAIL, *et al.*,

Defendants.

Case No. 1:20-cv-01187-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Richard Minton ("Minton"), a self-represented litigant in custody at the Klamath County

Jail, filed this action under 42 U.S.C. § 1983 ("Section 1983") against defendants Roger

Cummins, Medical Director of the Klamath County Jail ("Cummins"); nurses Karla Thomas

("Thomas") and Susan Cahill ("Cahill"); Chris Kaber, Sheriff of Klamath County ("Kaber");

Lieutenant Brian Bryson ("Lieutenant Bryson"); Sergeant Daniel Justman ("Sergeant Justman");

Sergeant Billy Stripling ("Sergeant Stripling"); and Klamath County Jail (collectively,

"Defendants"). Minton alleges that Defendants acted with deliberate indifference to his serious

medical needs as a pretrial detainee. (ECF No. 1.)

///

PAGE 1 – OPINION AND ORDER

Currently before the Court is Defendants' Motion for Summary Judgment. (ECF No. 28.) The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and the parties have consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Court grants Defendants' motion for summary judgment.

## BACKGROUND[1]

### I.   MINTON'S ARREST AND EMERGENCY ROOM VISIT

Minton was arrested in Klamath County on April 6, 2019. (Compl. at 2; Decl. of Elizabeth Jones ("Jones Decl.") ¶ 3.) Before Minton was booked into the Klamath County Jail, police officers transported him to the Sky Lakes Medical Center emergency room ("Sky Lakes") in Klamath Falls to be evaluated due to his apparent "altered mental status" at the time of his arrest. (Decl. of Brian Bryson ("Bryson Decl.") Ex. 1, at 1.) Minton's previous medical diagnoses include hypertension, post-traumatic stress disorder, and type II diabetes. (Id.)

In his report, the emergency room physician noted that Minton was "acting bizarrely" and that some of his behavior "seem[ed] volitional." (Id. at 2.) Sky Lakes performed a CT scan of Minton's brain, and the results were normal. (Id. at 4-5.) Minton was held overnight at Sky Lakes for further evaluation, and the following day he was transported to Klamath County Jail where he was booked and processed. (Id. at 3.)

### II.   MINTON'S MEDICAL CONDITIONS

#### A.   Minton's Episodes

Minton alleges that he suffers from "an undiagnosed neurological problem that causes multiple dizzy spells each day." (Compl. at 2.) In his complaint, Minton refers to these dizzy

---

[1] Unless otherwise noted, the following facts are either undisputed or presented in the light most favorable to Minton.

spells as "episodes." (*Id.*) Minton states that during these episodes, he experiences (1) "profound weakness," (2) "a complete loss of all motor function," and (3) "a loss of speech." (Bryson Decl. Ex. 1, at 2; Compl. at 2.) Before his arrest, Minton sought emergency medical treatment for these episodes on three occasions, but the resultant testing showed no signs of abnormality. (Compl. at 2-3.) Several doctors told Minton that his symptoms were possibly related to migraines or a magnesium deficiency. (Bryson Decl. Ex. 1, at 2; Ex. 2 at 56; Pl.'s Resp. at 2.)

On May 3, 2019, Minton complained to jail staff that he was suffering from an episode. (Bryson Decl. Ex. 2, at 1.) Thomas responded to Minton's complaints and observed Minton "talking with broken words" and complaining of weakness. (*Id.*) Thomas took Minton's vitals, which were in the normal range. (*Id.*) Minton reported to Thomas that he has suffered from similar episodes for "about 2 [to] 3 years" and that "he has seen many doctors and they can't find anything wrong." (*Id.*)

On June 26, 2019, a jail deputy called Thomas to attend to Minton, who was experiencing another episode. (Bryson Decl. Ex. 2, at 2.) Thomas responded to the call, took Minton's vitals, and documented the event. (*Id.*) Thomas noted in her medical report that when she arrived at Minton's cell block, he was "sitting on the bench [and] did not show any signs of difficulty breathing." (*Id.*)

On November 26, 2019, Minton experienced another episode after taking his evening medication. (*Id.* at 32.) Minton was seen by jail medical staff, who took his vitals and documented the incident. (*Id.*)

Around this time, Minton applied for social security disability benefits pursuant to the Social Security Act ("SSA"). (Bryson Decl. Ex. 3, at 1.) On October 28, 2019, the Oregon Department of Human Services Disability Determination Services ("DDS") notified Minton that

he had a neurology appointment scheduled for December 19, 2019, for the purpose of gathering medical information to evaluate his SSA claim. (Compl. at 3; Bryson Decl. Ex. 3, at 5; Decl. of Billy Stripling ("Stripling Decl.") ¶ 2.) On December 11, 2019, Thomas informed Lieutenant Bryson and Sergeant Stripling of Minton's scheduled SSA medical assessment. (Stripling Decl. ¶ 2.) At that time, Sergeant Stripling told Thomas that jail staff does not transport inmates to SSA benefits appointments, and the appointment was canceled. (Id. ¶ 3; Compl. at 3.)

On February 16, 2020, a jail deputy responded to reports that Minton was experiencing a medical issue. (Bryson Decl. Ex. 2, at 33.) The deputy encountered Minton sitting on the floor "slightly slumped over" and observed that Minton "could barely respond." (Id.) Cahill attended to Minton, took his vitals, and advised him that he needed to be taken to the emergency room due to his elevated blood pressure. (Id.) Minton refused emergency medical care and stated that he was starting to feel better. (Id.) Minton reported to Cahill that he had been to the hospital before but that doctors cannot figure out what causes his episodes. (Id. at 34.) Cahill continued to monitor Minton's vitals for fifteen minutes until they returned to a normal range. (Id. at 33.)

On May 2, 2020, Minton experienced a prolonged episode during dinner. (Compl. at 2-3; see also Decl. of Louis Young ("Young Decl.").) Other adults in custody ("AIC") who witnessed the episode observed that Minton appeared "limp and lifeless," that "his left hand and arm had become very cold and pale, as if he had lost all blood circulation," and that Minton "passed out twice, once at the dinner table and once while being carried to his cell." (Decl. of Rex Jones ("Jones Decl."); see also Decl. of Timothy McCarter ("McCarter Decl.").) When Cahill made contact with Minton, Minton told her that he was having difficulty breathing. (Bryson Decl. Ex., 2 at 41.) Cahill asked if Minton wanted to go to the emergency room, but he declined. (Id.) Cahill took Minton's vitals three separate times and indicated that his blood pressure was

elevated but that his oxygen levels were within normal range. (*Id.*) In her report, Cahill noted

that Minton was holding his breath as she took his vitals, and she made him start talking to her so

he could not continue to hold his breath. (*Id.* at 41-42.)

The next day, Minton filled out a medical request form and asked to see a neurologist for

testing. (*Id.* at 40; Compl. at 3.) Minton threatened to sue medical staff if they did not grant his

request. (Bryson Decl. Ex. 2, at 40.) The request was forwarded to Cummins that same day. (*Id.*

at 39.)

On May 4, 2020, Minton filled out another medical request form demanding that jail staff

"get me to a neurologist or cut me loose, preferably before I die." (*Id.* at 43.) Cahill responded to

Minton's request, stating that jail medical staff "has no control on this." (*Id.*; Compl. at 3.)

Minton filled out medical requests once a day for five days, requesting an appointment with a

neurologist or his release from jail. (*Id.* at 3-4; Bryson Decl. Ex. 2, at 45-49.) Cahill notified

Cummins of Minton's requests, and Cummins told Cahill to inform Minton that he "does not

meet the criteria to have a referral to [a] neurologist" and "due to [the] Covid lock down there are

no non emergent referral[s] to any specialist." (Bryson Decl. Ex. 2, at 51.)

On May 11, 2020, Minton filed a grievance demanding to see a neurologist or to be

released from jail. (Compl. at 10.) Sergeant Justman denied Minton's grievance, stating that jail

staff was aware of Minton's episodes, but Minton did not meet the criteria for a referral to a

neurologist at that time. (*Id.* at 11.) Minton appealed Sergeant Justman's grievance decision, and

on May 19, 2020, Lieutenant Bryson denied Minton's appeal. (*Id.* at 12.) On June 1, 2020,

Sheriff Kaber affirmed the denials. (*Id.* at 13.)

On May 16, 2020, Cahill placed Minton on medical lockdown. (Compl. at 3; Bryson

Decl. Ex. 2, at 57-60.) Minton went on a hunger strike and refused his medications to protest the

lockdown and Cummins' refusal to refer him to a neurologist. (*Id.*) On May 17, 2020, Minton was placed on suicide watch by jail deputies following a conversation where Minton stated, "[R]elease me or death." (Bryson Decl. Ex. 2, at 61.) On May 18, 2020, Cummins evaluated Minton and determined that he still did not meet the medical criteria to be referred to a neurologist. (Compl. at 3; Bryson Decl. Ex. 2, at 54.)

On June 22, 2020, Minton experienced another episode that lasted two hours. (Compl. at 2.) Minton reports that, during this episode, he went in and out of consciousness five times. (*Id.*) Cahill noted that when she made contact with Minton in his cell, he was "holding his breath" and that "he was breathing once every 5-8 seconds." (Bryson Decl. Ex. 2, at 55.) Cahill took Minton's vitals ten times within a ten-minute period and noted elevated blood pressure and normal oxygen levels. (*Id.*) Minton experienced two additional episodes on August 14 and October 15, 2020. (Suppl. Jones Decl.; Decls. of James Kilburn and Jason Eason.) An AIC who attended to Minton during the August 14, 2020, episode observed Minton lose consciousness and his pulse stop three times. (Suppl. Jones Decl.) Since his arrest, Minton reports that he has experienced twenty-three episodes while in custody at the Klamath County Jail. (Compl. at 3, 17.)

### B.    Minton's Eye Condition

On August 1, 2019, Milton filled out an inmate medical request form complaining that his eyesight was worsening and he asked jail medical staff to contact the Veterans Administration ("VA") for his medical history. (Bryson Decl. Ex. 2, at 3.) On August 2, 2019, Thomas provided Minton with a written response to his request, stating that "[w]e have no medical reason to recheck your eyes at this time you have only been here 3 months" and that Thomas "will need to look at records." (*Id.*) Minton recalls Thomas responded to his kyte by writing, "[w]e do not believe you." (Compl. at 4.)

On August 5, 2019, Thomas faxed a Request of Information to the Bend VA, requesting information regarding Minton's current diagnoses, medication, and chart notes related to Minton's eye conditions. (*Id.* at 4.) Minton's medical records from the VA revealed that he suffers from diabetic cataracts. (*Id.* at 5.) On August 20, 2019, Thomas communicated to jail staff that Minton's requests for an eye examination were not urgent and instructed jail staff that if Minton continues to complain or if he shows "specific eye problems," then she would check on him. (*Id.*)

On September 24, 2019, Cummins performed an eye exam on Minton. (*Id.* at 7.) Minton reported that he was having difficulty reading and focusing for the past two months. (*Id.*) Minton reported no difficulty walking up or down stairs, getting meals, performing blood sugar testing, and reading the results of his tests. (*Id.*) Cummins ordered eye vitamins for Minton and requested an ophthalmology appointment with an outside medical provider. (*Id.*) Cummins noted in his report that he did not see any emergent issues at that time. (*Id.*)

On October 4, 2019, Minton saw Dr. Stevens at the Klamath Eye Center. (*Id.* at 8-16.) Dr. Stevens performed an eye exam and recommended that Minton be referred to a retina specialist. (*Id.* at 8.) On October 25, 2019, Minton saw Dr. Hyatt at the Retina Vitreous Center, who diagnosed him with proliferative diabetic retinopathy and began to treat Minton. (*Id.* at 18-21.) Dr. Hyatt performed laser surgery on his right eye and recommended Minton continue treatment for his condition. (*Id.* at 21.) Minton returned to the Retina Vitreous Center for a follow-up appointment on November 15, 2019, where he received a triamcinolone injection in his right eye. (*Id.* at 23-27.)

On December 1, 2019, Minton sent a medical kyte complaining that his eyesight continued to fail, despite ongoing treatments with a specialist. (*Id.* at 30.) Minton continued to

receive treatment for his eye condition on a regular basis. (Bryson Decl. Ex. 5; Pl.'s Resp. at 5-6.)

On February 8, 2020, Minton asked Cahill and another deputy if he could be "matrixed" due to his eye condition. (Bryson Decl. Ex. 2, at 37.) Cahill told Minton that she was not qualified to answer that question, and suggested Minton send a kyte to a sergeant regarding this request. (*Id.*) On March 9, 2020, Minton completed a medical request form complaining of double vision and requesting a "compassionate matrix" from jail medical staff. (*Id.* at 38.)

## III.    MINTON'S LAWSUIT

On July 17, 2020, Minton filed this action alleging that Defendants acted with deliberate indifference to his serious medical needs as a pretrial detainee. Minton seeks injunctive relief requiring that: (1) Minton receive proper medical testing with a specialist: (2) the County replace current medical staff, including Cummins, Cahill, and Thomas; (3) the County Jail cease charging jail inmates for medical services and medication, and reimburse inmates who have paid for medical expenses from their commissary account; (4) negative balances on jail inmates' commissary accounts be "wiped clean"; (5) the County Jail grant inmates' requests for copies of their medical records; and (6) the County Jail approve a specialty diet for Minton, who suffers from diabetes. (Compl. at 6-9.) Minton also seeks $10 million in damages for "mental distress and punitive measures."[2] (Compl. at 7.)

---

[2] Minton filed a motion for leave to amend his complaint to increase his requested damages from $10 million to $30 million, and to add a claim against an unidentified defendant for increased access to the jail's law library. (ECF No. 23.) The Court denies Minton's motion in light of the Court's entry of summary judgment for Defendants, and because adding a new, unrelated claim relating to law library access violates joinder rules prohibiting unrelated claims against unrelated parties. *See* FED. R. CIV. P. 20(a)(2) (instructing that a plaintiff may bring a claim against multiple defendants only where "any right to relief is asserted . . . with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all defendants will arise in the action"); *see also Ransom v. McCabe*, No. 1:13cv01779 AWI DLP PC, 2014 WL 4472695, at *5 (E.D. Cal. Sept. 11, 2014)

**DISCUSSION**

## I.      STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## II.     ANALYSIS

### A.      Inadequate Medical Care

Minton alleges that Defendants acted with deliberate indifference to his serious medical needs by (1) ignoring his requests to see a neurologist and (2) failing to provide prompt treatment for his eye condition. (Compl. at 2-6.) Defendants move for summary judgment on Minton's claims. (Def.'s Mot. at 12-21.) For the reasons that follow, the Court grants Defendants' motion.

#### 1.      Applicable Law

Section 1983 provides a private right of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. §

---

(noting that a plaintiff "may not bring unrelated claims against unrelated parties in single action" under the rules governing joinder) (citations omitted).

1983. "To state a claim under [Section] 1983, a plaintiff [1] must allege the violation of a right secured by the Constitution and laws of the United States, and [2] must show that the alleged deprivation was committed by a person acting under color of state law." *Naffe v. Frye*, 789 F.3d 1030, 1035-36 (9th Cir. 2015) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

"The Due Process Clause of the Fourteenth Amendment affords pretrial detainees a right to adequate medical care." *Hill v. Or. State Hosp.*, No. 6:19-cv-00409-SB, 2020 WL 5245220, at *5 (D. Or. Mar. 31, 2020) (citing *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018), *cert. denied sub nom. Cnty. of Orange, Cal. v. Gordon*, 139 S. Ct. 794 (2019)). A pretrial detainee's medical care claim "arise[s] under the Fourteenth Amendment's Due Process Clause, rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause." *Id.* (quoting *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1069-70 (9th Cir. 2016) (en banc)); *see also Husted v. Oregon*, No. 3:19-CV-00153-YY, 2019 WL 2270593, at *2 (D. Or. May 28, 2019) ("A pretrial detainee's claim of denial of adequate medical care arises under the Due Process Clause of the Fourteenth Amendment.") (citing *Bell v. Wollfish*, 441 U.S. 520, 527 n.16 (1979) (holding that the Due Process Clause applies to pretrial detainees' claims because a "[s]tate does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law")). Thus, the Court must assess Minton's medical care claim under the Fourteenth Amendment, not the Eighth Amendment. *See Gordon*, 888 F.3d at 1124.

"A claim for violation of the right to adequate medical care brought by a pretrial detainee against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard." *Warren v. Battle*, No. 6:18-cv-00329-YY, 2020 WL 61037, at *6 (D. Or. Jan. 6, 2020); *see also Horton by Horton v. City of Santa Maria*, 915 F.3d

592, 602 (9th Cir. 2019) (recognizing that the objective deliberate indifference standard guides analysis of a pretrial detainee's Fourteenth Amendment medical care claim); *Gordon*, 888 F.3d at 1124-25 ("[W]e hold that claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." (quoting *Castro*, 833 F.3d at 1070).

The Fourteenth Amendment provides more expansive protections than the Eighth Amendment. *See Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1246 n.5 (9th Cir. 2016) ("Eighth Amendment protections apply only once a prisoner has been convicted of a crime, while pretrial detainees are entitled to the potentially more expansive protections of the Due Process Clause of the Fourteenth Amendment." (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015) and *Castro*, 833 F.3d at 1067-72)); *cf. Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003) (recognizing that "even though the pretrial detainees' rights arise under the Due Process Clause, the guarantees of the Eighth Amendment provide a *minimum standard of care* for determining their rights, including the rights to medical and psychiatric care." (collecting cases)). Indeed, the Eighth Amendment proscribes cruel and unusual punishment of individuals in custody, while the Fourteenth Amendment proscribes punishing a pretrial detainee at all. *See Kingsley*, 576 U.S. at 400 (noting that, "most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically'").

Four elements establish a "pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment":

> (i)   the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (ii)  those conditions put the plaintiff at substantial risk of suffering serious harm;

(iii)     the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(iv)     by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Id.* (quoting *Castro*, 833 F.3d at 1070). The "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id. (*quoting *Castro*, 833 F.3d at 1070). Thus, the plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (citing *Castro*, 833 F.3d at 1071). In other words, "a plaintiff must show that the denial, delay, or otherwise unreasonable course of medical care was taken in 'reckless disregard' of an excessive risk to the plaintiff's health or safety." *Fricano v. Lane Cnty.*, No. 6:16-cv-01339-MC, 2018 WL 2770643, at * 5 (D. Or. June 8, 2018) (quoting *Gordon*, 888 F.3d at 1125).

## 2.     Analysis

### a.     Minton's Episodes

#### 1)     Cummins

Minton alleges that Cummins was deliberately indifferent to his serious medical needs by failing to refer him to a neurologist for specialized testing to determine the cause of his episodes. (Compl. at 3-4.) The Court disagrees.

Even when viewing the evidence in the light most favorable to Minton, the record demonstrates that although Cummins did not approve Minton's request to see a neurologist, he consistently monitored and evaluated Minton's health during his incarceration at Klamath County Jail. To establish deliberate indifference, Minton must set forth sufficient facts

suggesting "that the course of treatment" Cummins "chose was medically unacceptable under the circumstances" and was chosen "in conscious disregard of an excessive risk" to Minton's health. *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (citation omitted). Minton does not offer any evidence to demonstrate that Cummins' treatment decisions were medically unacceptable. Importantly, the record reflects, and Minton acknowledges, that Minton suffered from similar episodes for many years before his arrest. (Compl. at 2; Pl.'s Resp. at 2; Bryson Decl. Ex. 1, at 2; *id.* Ex. 2 at 34, 56.) Indeed, Minton also acknowledges that despite prior medical evaluations following his episodes, no medical provider has opined that he suffers from a neurological condition. (Pl.'s Resp. at 2; Bryson Decl. Ex. 1, at 2; *id.* Ex. 2, at 56.)

At most, the record reflects a difference of medical opinion between Minton and Cummins regarding the need for another neurological examination. After his arrest, Minton received an examination and CT scan of his brain that showed no abnormalities. (Bryson Decl. Ex. 1, at 4-5.) Cummins also evaluated Minton and determined that he did not display symptoms warranting referral to a neurologist. (Bryson Decl. Ex. 2, at 54.) The fact that Minton repeatedly requested another neurology evaluation does not render Cummins' course of treatment deliberately indifferent. *See Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (explaining that "'a plaintiff's showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference'") (citation omitted); *Hodges v. Corizon Health, Inc.*, No. 6:15-cv-00521-AC, 2019 WL 747644, at *18 (D. Or. Sept. 10, 2019), *report and recommendation adopted*, No. 6:15-cv-00521-AC, 2020 WL 42791 (D. Or. Jan. 2, 2020), *aff'd*, 2020 WL 7211266 (9th Cir. 2020) ("Hodges offers only a difference of opinion between himself and various medical providers on the adequacy of the care Defendants provided him after his 'heart attacks.' Such

evidence does not support a finding of reckless disregard or deliberate indifference."); *see also Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("[T]he question whether . . . additional diagnostic techniques or forms of treatment [are warranted] is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.").

The undisputed facts do not support a finding that Cummins acted with deliberate indifference to Minton's medical needs. In the opinion of Cummins and other medical providers, a further neurological examination was not necessary, and the care Cummins provided Minton was adequate and reasonable under the circumstances. Accordingly, Cummins is entitled to summary judgment on Minton's claim.

### 2)    Cahill

Minton alleges that Cahill was deliberately indifferent to his medical needs by not noticing that he "stopped breathing for over a minute" during an episode on May 2, 2020. (Compl. at 2.) However, the record contains no evidence to support this assertion. Rather, according to the medical records, Cahill acknowledged Minton's reports that he was having difficulty breathing and took his vitals three separate times. (*See* Bryson Decl. Ex. 2, at 41, Cahill's medical notes indicating that she "stayed with [Minton] as he said he couldn't breathe.") Contrary to Minton's assertions, the evidence indicates that his oxygen levels during this event were 100 percent, 97 percent, and 96 percent. (*Id.*) In her report, Cahill noted that Minton appeared to be holding his breath as she took his vitals and that she prompted Minton to begin speaking to prevent him from continuing to hold his breath. (*Id.* at 41-42.) Further, on two separate occasions, Cahill asked Minton if he wanted to go to the emergency room, and he declined. (Bryson Decl. Ex. 2, at 33; *Id.* at 41.) The evidence, undisputed by Minton,

demonstrates that Cahill consistently monitored Minton after his episodes and provided him access to adequate medical care.

Minton also alleges that Cahill placed him on medical lockdown "to make [him] stop" submitting requests to see a neurologist. (Compl. at 3.) However, the medical records demonstrate that Cahill placed Minton on medical lockdown after she received a kyte from him stating that he was experiencing two to three "dizzy spells" a day and that he had been observed walking around his cell block with his eyes closed. (Bryson Decl. Ex. 2, at 57.) Cahill noted in her medical report that she considered this a "huge safety risk," and ordered Minton to remain on lockdown until she heard back from Cummins on how to proceed. (*Id.*) This evidence supports a finding that Cahill acted in response to concern for Minton's medical needs, not with deliberate indifference to his medical needs.

The undisputed facts do not support a finding that Cahill acted with deliberate indifference to Minton's medical needs. Accordingly, Cahill is entitled to summary judgment on Minton's claim.

### 3) Sergeant Justman, Lieutenant Bryson, and Sheriff Chris Kaber

Minton appears to allege that Sergeant Justman, Lieutenant Bryson, and Sheriff Kaber violated his constitutional rights by denying his grievance requesting to see a neurologist. (Compl. at 2.) "[A] plaintiff may establish liability on the part of defendants involved in the administrative grievance process by alleging that his appeal put the defendants on notice that he had a serious medical need that was not being met, and their denial, therefore, constituted deliberate indifference to his medical need." *Pickett v. Repasky*, C-11, 4367 TEH (PR), 2012 WL 1231811, at *3 (N.D. Cal. Apr. 12, 2012) (citing *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990)).

The Court finds that Sergeant Justman, Lieutenant Bryson, and Sheriff Kaber are entitled to summary judgment on Minton's claims. In denying Minton's grievance, all three defendants relied on Cummins' medical opinion regarding Minton's medical needs and recommended course of treatment. (*See* Compl. at 11-13.) As explained above, the Court concludes that the decision to deny Minton's request to see a neurologist did not violate his constitutional rights, and the care provided to Minton was adequate and reasonable under the circumstances. *Cf.* *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (concluding that non-medical prison staff who denied the plaintiff's grievance of his treatment plan were not deliberately indifferent to the plaintiff's medical needs when staff "relied on the medical opinions of the staff dentists who had investigated [the plaintiff's] complaints and already signed off on the treatment plan").

Furthermore, the record does not support a finding that Sergeant Justman, Lieutenant Bryson, and Sheriff Kaber were deliberately indifferent to Minton's medical needs by denying Minton's grievances. To the contrary, the evidence demonstrates that all three defendants investigated Minton's complaints, reviewed the relevant documentation, and responded directly to Minton's medical concerns raised in his grievance. *See* *Mitchell v. Cox*, No. 2:12-cv-00499-RFB-NJK, 2016 WL 4071956, at *7 (D. Nev. July 28, 2016) (finding that the prison official who reviewed and denied the plaintiff's grievance was not deliberately indifferent to the plaintiff's medical needs when he inquired into the treatment provided to the plaintiff, addressed it in his response, and denied the plaintiff's grievance on that ground).

For example, Sergeant Justman reviewed the medical records from Minton's May 2, 2020, episode and Cummins' findings from the May 18, 2020, visit and concluded that "at this time, we do not have a medical reason to send you to a neurologist nor do we have a reason to release you as you have requested." (Compl. at 11.) Similarly, on appeal, Lieutenant Bryson

reviewed Sergeant Justman's denial and found that Minton "was seen in person by Roger

Cummins . . . for a Neurological referral exam which was determined to not be warranted."

(Compl. at 12.) Sheriff Kaber also reviewed Minton's initial grievance, both denials, and the

relevant medical records before concluding that Cummins conducted "a well-documented

examination with a resulting medical opinion that a referral to a neurologist was not warranted

unless more specific neurological symptoms or consistent complaints warrant such a referral."

(Compl. at 13.) Based on this record, the undisputed facts do not support a finding that the

defendants acted with deliberate indifference to Minton's medical needs. Accordingly, the Court

grants summary judgment in favor of Sergeant Justman, Lieutenant Bryson, and Sheriff Kaber.

### 4)    Sergeant Stripling

Minton also alleges that Sergeant Stripling denied him access to adequate medical care

when he canceled his SSI medical assessment with a neurologist. (Compl. at 3.) However, the

record shows that Minton's neurology appointment was not for medical care. Rather, DDS

scheduled a neurology appointment for Minton "because more medical information [was] needed

to evaluate [his] claim for Social Security disability benefits." (Bryson Decl. Ex. 3, at 5.) Indeed,

the appointment notice stated that Minton's appointment was "for evaluation purposes only and

no treatment [would] occur." (*Id.*) Further, the undisputed evidence indicates that Klamath

County Jail does not transport inmates to social security disability benefits appointments

(Stripling Decl. ¶ 3), and that Stripling explained to Minton the reason for canceling his

appointment. (Bryson Decl. Ex. 3, at 8.) Because Minton's neurology appointment was for the

purpose of determining if he qualified for social security disability benefits, and not for medical

treatment, Minton's deliberate indifference claim against Sergeant Stripling fails. Accordingly,

the Court grants summary judgment in favor of Sergeant Stripling.

///

**b.    Minton's Eye Condition**

Minton argues that Defendants were deliberately indifferent to his need for medical treatment of his eye condition. Specifically, Minton alleges that Thomas violated his constitutional rights by responding to his August 1, 2019, medical kyte requesting eye care with the note, "We do not believe you." (Compl. at 4.) To the contrary, the evidence shows that Thomas responded by writing, "[w]e have no medical reason to recheck your eyes at this time. You have only been here 3 months. I will need to look at records." (Bryson Decl. Ex. 2, at 3.) The record also indicates that, after receiving Minton's request, Thomas requested Minton's medical records from the VA a few days later. (Id. at 4.) Cummins examined Minton's eyes on September 24, 2019, and referred Minton to an outside specialist for treatment. (Id. at 7.) The Court finds that Defendants took objectively reasonable steps to address Minton's eye condition.

Additionally, it is undisputed that Minton received ongoing treatment for his eye condition. (See Pl.'s Resp. at 5-6, noting that while in custody at Klamath County Jail, Minton has received "[f]ive laser surgeries and shots in [his] eyes every six weeks"; see also Bryson Decl. Ex. 5.) According to the medical records, Minton underwent two laser surgeries in his right eye, three surgeries in his left eye, and he received follow-up treatments every four to six weeks. (Bryson Decl. Ex. 2, at 23-27; id. Ex. 5.)

Based on the record before the Court, no reasonable juror could find that Defendants acted with deliberate indifference to Minton's eye condition. See Lyons v. Multnomah Cnty., 743 F. App'x 137, 138 (9th Cir. 2018) ("The record shows no objective deliberate indifference by Defendants in response to [the plaintiff's] dental issue given the frequency of medical appointments and the lack of any evidence that it was a dental emergency."). Therefore, the Court enters summary judgment for Defendants.

///

### 3.    Conclusion

Minton has failed to establish that Defendants' responses to Minton's medical issues were medically unacceptable under the circumstances, that Defendants acted in conscious disregard of an excessive risk to Minton's health, or that Defendants acted with deliberate indifference in their treatment of Minton. Accordingly, Defendants are entitled to summary judgment on Minton's Fourteenth Amendment claims.

### B.    *Monell* Liability

Minton alleges in his complaint that Defendants are liable for a "patern [sic] of violation[s]." (Compl. at 4.) The Court construes Minton's complaint as bringing a *Monell* claim against Klamath County. Defendants argue that they are entitled to summary judgment on Minton's *Monell* claim because, among other reasons, Minton has failed to establish that they violated his constitutional rights. (Def.'s Mot. at 21.) The Court agrees.

To prevail on a *Monell* claim under Section 1983, a plaintiff must show that a municipal custom or policy caused the violation of his constitutional rights. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). "[M]unicipalities may be liable under § 1983 for constitutional injuries pursuant to: (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton*, 915 F.3d at 602-03. "To establish *Monell* liability, Plaintiffs must allege that: (1) they were deprived of a constitutional right; (2) the municipality had a policy, custom, or practice; (3) the policy, custom, or practice amounted to deliberate indifference of the plaintiffs' constitutional rights; and (4) the policy, custom, or practice was the 'moving force' behind the constitutional violation." *Cantu v. City of Portland*, No. 3:19-cv-01606-SB, 2020 WL 2952972, at *3 (D. Or. June 3, 2020) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). If no constitutional violation occurred, then a municipal liability claim necessarily

fails. *See City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (holding that a *Monell* claim cannot

survive without an underlying constitutional violation).

The threshold question in determining whether Minton can establish *Monell* liability is

whether a constitutional violation occurred here. As explained above, Defendants did not violate

Minton's Fourteenth Amendment rights by acting with deliberate indifference to his medical

needs. Because no constitutional violation occurred, Minton's *Monell* claim fails as a matter of

law. *Id.*[3]

### C.    Minton's Discovery Requests

After Defendants filed their motion for summary judgment, Minton filed three discovery

motions, requesting all of his medical records and kytes while at Klamath County Jail, the

medical qualifications of defendants Cummins, Thomas, and Cahill, and any video evidence of

his July 30, August 14, and September 3, 2020 episodes. (ECF Nos. 39, 40, 41.) The Court

construes Minton's motions as an argument that he cannot "present facts essential to justify [his]

opposition" to Defendants' motion for summary judgment without the requested discovery. *See*

FED. R. CIV. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified

reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer

considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take

discovery; or (3) issue any other appropriate order.").

Defendants responded to Minton's motions by producing the requested materials to

Minton, with the exception of the video evidence, which Defendants did not retain in the

ordinary course of business. (Defs.' Resp. at 2.) In his reply, Minton challenges only Defendants'

---

[3] In light of the Court's entry of summary judgment, the Court does not reach
Defendants' alternative arguments.

production of his medical kytes, alleging that Defendants have not produced all of them. (Pl.'s Reply at 2-3.) However, the Court has viewed the summary judgment record in the light most favorable to Minton, and credits Minton's allegations that he submitted a large volume of kytes relating to his episodes and his eye condition while housed at the Klamath County Jail, sometimes on a daily basis. Supplementing the summary judgment record with a copy of all of the kytes Minton submitted would not change the Court's analysis herein. Accordingly, the Court denies Minton's discovery motions as moot.

## CONCLUSION

For the reasons stated, the Court DENIES Minton's motion for leave to amend complaint (ECF No. 23), GRANTS Defendants' motion for summary judgment (ECF No. 28), and DENIES AS MOOT Minton's discovery motions (ECF Nos. 39, 40, 41).

DATED this 8th day of February, 2021.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge